**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GIA WINKLER and JASON WINKLER, )<br><br>*Plaintiffs,* )<br><br>v. )<br><br>MADIX, INC., a foreign corporation, )<br><br>*Defendant.* )<br>_____ )<br><br>MADIX, INC., a foreign corporation, )<br><br>*Third-Party Plaintiff,* )<br><br>v. )<br><br>WALGREEN CO., an Illinois corporation, )<br><br>*Third-Party Defendant.* ) | No. 16 C 341<br><br>Hon. Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Gia and Jason Winkler sued Defendant Madix, Inc. in state court after Gia was injured when she fell from a shelving unit made by Madix during her shift at a Walgreen's retail store where she worked. *See* (Dkt. No. 2-1, at 2–3). She sued for strict product liability (Count I) and Jason sued for loss of consortium for the same occurrence (Count II). *Id.* at 1–4. After removing the case to federal court, Madix now seeks to bar the opinions and testimony of Plaintiffs' expert witness, *see* (Dkt. No. 68-1), and for summary judgment as a matter of law. *See* (Dkt. No. 69-1). For the following reasons the Court grants the Motion *In Limine* to Exclude the Opinions and Expert Testimony and the Motion for Summary Judgment. (Dkt. Nos. 68, 69).

# BACKGROUND

The following are facts from the parties' Local Rule 56.1 Statements and are undisputed unless otherwise noted. The Winklers are Illinois residents and Madix is a Texas corporation. *See* (Dkt. No. 69-2, at ¶¶ 41, 42) (Def.'s SOF). Gia Winkler worked for Walgreens starting in 2003 and was the Assistant Store Manager of its Mundelein, Illinois location in January 2014. *Id.* ¶¶ 1, 2. The Walgreens location where Winkler worked used storage shelving units ("storage units") manufactured by Madix in its stock room.[1] *Id.* ¶ 2.

Produced with essentially no design modifications for the last thirty years, the storage units are 8 feet tall by 8 feet long by 3¾ feet wide, consisting of five shelving grids, or grates ("shelves"), that are approximately 20–22 inches apart.[2] *Id.* ¶¶ 3, 8. They have a metal frame with opposing horizontal metal beams that connect the end frames at each shelf level, with four deck supports spanning from beam to beam where the shelves are placed to create storage surface. *Id.* ¶¶ 3, 4. Each shelf is made of three-inch square wire grate (or grid) construction and measure 41 ¾ inches deep by 47¾ inches wide and weigh 26½ pounds each.[3] *Id.* ¶ 5. When positioned on the deck supports, each shelf has a ¾-inch recess, leaving them 0.2 inches below the top surface of the beams they rest upon. *Id.* ¶ 6. The shelves are not secured to the storage unit's frame and can become dislodged if pulled upwards but will stay in position without any vertical pulling component. *Id.* ¶ 7; *see also* (Dkt. No. 82, at ¶ 3) (Def.'s Resp. to Pl.'s SOAF). The storage units do not contain any warning label informing consumers that they are not

---

[1] The parties use varying terms when describing the Madix product such as "shelving unit" and "storage unit" but the Court will refer to the product as a whole as "storage unit" for the purpose of clarity.

[2] Similarly, the shelves are referred to as "grids," "grates," and "shelving units" but the Court applies the term "shelves" or "shelf" to refer to the five individual metal grids that form the surface area of the storage units.

[3] Imagine a fence or the side of a cage.

intended for climbing. *See* (Dkt. No. 77, at ¶ 4) (Pl.'s SOAF). Madix places thousands of these storage units in the marketplace annually. *See* (Dkt. No. 69-2, at ¶ 9).

As Assistant Store Manager, Winkler's responsibilities included retrieving merchandise from the stock room for placement on the store floor and organizing the stock after merchandise deliveries by sorting and placing the goods onto the shelves of the storage units. *Id.* ¶¶ 13, 14. Both tasks required familiarity and interaction with the storage units and Winkler understood that they were large grated shelves. *Id.* ¶¶ 12, 14. Prior to January 20, 2014, Walgreens conducted safety training during which Winkler was instructed never to climb on storage shelves, to always use a ladder to reach upper shelves, and to never use a makeshift ladder. Walgreens trained Winkler that walking on shelves on storage units violated OSHA regulations.

In spite of this training, on January 20, 2014, Winkler climbed a storage unit located in the middle of the stock room to retrieve a 3-by-6-inch box situated on the fifth or top shelf. *Id.* ¶¶ 25, 26. With her feet set on the fourth shelf, Winkler had to stretch across the top shelf to reach the small box and, in doing so, she grabbed hold of the top shelf to pull herself up and closer to the box. *Id.* ¶¶ 26, 27. Her actions resulted in the top shelf being lifted and dislodged, and Winkler fell from the storage unit to the ground. *Id.* ¶ 28; *see also* (Dkt. No. 69-3, Ex. A, 85:6–86:14; 105–107:24) (Gia Winkler Dep.). Also in the stock room that day was Christina Cartina, the Store Manager of the Mundelein Walgreens. *See* (Dkt. No. 77, at ¶ 24). Although she did not witness Winkler's fall, she admits that she, too, climbed the storage units in the stock room at prior times despite recognizing that it is unsafe to do so and that doing so is contrary to her Walgreens training. *See* (Dkt. No. 82, at ¶¶ 25, 26, 27).

As a result of the injuries sustained on January 20, 2014, Winkler filed this current suit against Madix alleging strict product liability under Illinois law for a design defect in the storage

unit because the shelves should have been secured to the frame of the storage units and because there were no warning labels on the units – either warning the employees not to climb the storage units or warning that the top shelves were not secured to the frame. *See* (Dkt. No. 2-1) (Pl.'s State Complaint).

## DISCUSSION

Gia Winkler seeks damages sounding in strict product liability (Count I). *See* (Dkt. No. 2-1, at 1–4). Her spouse, Jason Winkler, seeks to recover for loss of consortium on a similar product liability theory (Count II). *Id.* at 4. Madix moves to bar Winkler's expert, Kevin Smith, arguing he is not qualified and his testimony is unreliable under the Federal Rules. *See* Fed. R. Evid. 702; (Dkt. No. 68-1, at 2). Madix further moves for summary judgment arguing the record does not show the existence of a design defect—in the product's construction or for lacking warning labels—that proximately caused Winkler's injury. *See* (Dkt. No. 69-1, at 7–8). The Court starts with the Motion to Bar Expert Testimony given its relevance to judgment as a matter of law.

I.      **Motion to Bar Expert Testimony of Kevin Smith**

A.      **Legal Standard**

"[T]he admissibility of expert testimony is governed by Federal Rules of Evidence 702 and the Supreme Court's decision in *Daubert v. Marrell Dow Pharms., Inc.*, 509 U.S. 579 [] (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006)). Trial judges act as "gatekeepers" to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a witness

qualified as an expert by "knowledge, skill, experience, training, or education may testify in the form of an opinion" if they possess the satisfy the following conditions:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *C.W. ex rel. Wood*, 807 F.3d at 834. "The key to the gate is not the ultimate correctness of the expert's conclusions . . . [rather] it is the soundness and care with which the expert arrived at her opinion[.]" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citations omitted).

In evaluating the expert's proposed testimony, the Court should "scrutinize the proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks and citation omitted). The expert's proponent, the Plaintiffs in the present matter, bear the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See* Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. First the Court must determine whether knowledge, skill, experience, training, or education qualify the proposed witness as an expert. Then the Court must decide whether the reasoning or methodology underlying the expert's testimony is reliable.

Third, the Court assesses whether the expert's proposed testimony will assist the trier of fact in understanding the evidence or determine a factual issue. *See Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011). However, the Court will only address opinions brought to its attention by the parties. *See e.g., Schuring v. Cottrell, Inc.*, 244 F. Supp. 3d 721, 728 (N.D. Ill. Mar. 27, 2017).

## B.    *Daubert* Analysis

The Plaintiffs' expert draws three conclusions in his report regarding how the storage units are unreasonably dangerous. First, the storage units contain a design defect for failure to secure the shelves securely to the deck supports, thus causing them to easily dislodge. *See* (Dkt. No. 68-2, at 7). Second, the storage units were defective because they did not contain a warning label advising employees of the potential for "accidental shelf dislodgement." *Id.* And third, the storage units were defective because they did not contain a warning label "identify[ing] that hazard of a fall when climbing the racks." *Id.* at 6. In applying the *Daubert* analysis the Court has a duty "to make certain than an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In simpler terms, this requires the Court to ensure Mr. Smith is qualified, uses reliable methods, and that the testimony will be helpful to the trier of fact.

### 1.    *Qualifications*

As an engineer licensed in Illinois, with degrees in mechanical engineering and aerospace engineering, it is not immediately clear how Mr. Smith possesses the requisite "personal experience" or is a person who qualifies as "an expert in the relevant field" regarding the likelihood of accident mitigation through the use of warning labels on the product in question.

Mr. Smith admitted he has previously never given an opinion as to whether a heavy-duty shelving system was unreasonably dangerous. *See* (Dkt. No. 74, at 44:18–21) (Smith Deposition). He further testified that he has never given a prior opinion as to whether a warning not to climb was necessary. *Id.* at 56:12–14.

However, Mr. Smith's professional history includes a variety of indicators suggesting his experience with safety measures including "[i]nvestigation, testing, accident reconstruction, and human factors analysis regarding specific issues relating to and resulting from analysis of equipment including ... Ladder design/safety ... Aerial Work Platforms (Booms and Scissors) ... Scaffolding ... *Warning Sings* ... [and] Fall Protection & Equipment." *See* (Dkt. No. 74, Ex. 2, at 16) (Smith C.V.) (emphasis added). Furthermore, Smith serves as the Chairman of Task Force to study fall protection. *Id.* at 17. These credentials, although not an exact form-fit to experience with warning labels, are sufficient as the *Daubert* standard does not require particular credentials for an expert witness. *See Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 590 (7th Cir. 2000). "Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Id.*; *see e.g., Lott v. ITW Food Equip. Gp. LLC*, 2013 WL 3728581, at *14 (N.D. Ill. Jul. 15, 2013).

His current and prior employment record, coupled with his dual degrees in mechanical and aeronautical engineering and his personal experience discussed above, render him qualified to provide an opinion on the design and manufacture of the storage units.

### 2. *Reliability of Methodology*

Madix argues that Smith does not employ a reliable methodology supporting his opinions as to the need for warning labels and the design defect of the storage units, given that he did not test any alternative designs. *See* (Dkt. No. 68-1, at 8-9, 11–14). It is true that "[c]ourts value the testing of alternative designs to form the basis of opinions offered about them in product defense

cases." *See Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 535–36 (7th Cir. 2000); *see also Schuring*, 244 F. Supp. 3d at 730. And while *Schuring* emphasizes that the law does not require testing—only that a theory has been or can be tested, "[i]n alternative design cases, [the Seventh Circuit] ha[s] consistently recognized the importance of testing the alternative design as a factor that the district court should consider in evaluating the reliability of the proposed expert testimony." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (internal quotation marks and citation omitted).

*Daubert* provides other "factors to aid judges in determining whether [a] particular expert opinion is grounded in reliable scientific methodology . . . [including] (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Daubert*, 509 U.S. at 593–94; *Dhillon*, 269 F.3d at 869; *C.W. ex rel. Wood*, 807 F.3d at 835. It is worth noting that this list is "neither exhaustive nor mandatory, and in some instances the district court is permitted to determine "whether there is too great an analytical gap between the data and the opinion proffered." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *see also C.W. ex rel. Wood*, 807 F.3d at 835. Reliability is ultimately determined on a case-by-case basis. *See Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007). Most important in its role as gate-keeper, however, the Court looks to the appropriateness of the proposed expert's methodology. "An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999)).

Smith has never opined as an expert in the safe design and securements of the grids of a storage unit nor has he written about these products. He also has never participated in the design of similar units. He has no prior experience analyzing Madix storage units or similar products and he did not inspect or experiment on the particular storage unit in question. *See* (Dkt. No. 75, at ¶¶ 32, 33, 34.) In spite of this lack of knowledge, Smith did not research the methodology that Madix or others designing storage units use and he never even inspected the storage unit in question. He never tested other types of fasteners or stabilizing mechanisms on the unit in question or any other similar units. In fact, his sole research was to do a "Google search" of potential warning labels that he believed could have been used and then to design his own label which he only revealed to Madix during his deposition.

Excerpts of Smith's testimony and report opine that use of "simple metal clips ... or even the use of simple cable ties" would serve as an "economically and technologically feasible" means of securing the shelves to the deck supports of the storage units. *See* (Dkt. No. 68-2, at 6); (Dkt. No. 74, at 55:2–22). But Smith admits that he did not create any type of "mockup" in which the clips and the cable ties were utilized. *See* (Dkt. No. 74, at 55:6–9). Additionally, neither the report nor his subsequent testimony cites to any of the other *Daubert* factors to support his ultimate conclusion that use of metal clips or cable ties would constitute a superior design. Significantly, Smith failed to consider the actual details of the fall by calculating the weight of the person on the storage unit, the weight of items on the shelf, the way the shelf was grabbed, or the how the design of the shelf acted under those specific circumstances. In fact, his conclusion was based essentially on the fact that the Plaintiff fell and that no clips or fasteners were on the shelf. Yet, he points to no other manufacturer who incorporates his proposed design nor to any industry studies regarding a secured storage unit. *See Bourelle*, 220 F.3d at 539

(expert report rejected when expert failed to prepare detailed designs or calculations, economic feasibility study and risk utility testing). Without evidence of a proposed alternative design that has been favorably subjected to peer review or that has passed a regulatory body or standards organization, the Court is left with merely Smith's speculative and unsupported conclusion. *See, e.g., Dhillon*, 269 F.3d at 869–70. Ironically, even the proposed alternative that Smith suggested—cable ties—appears to have been rejected by him during cross examination; regardless, even the cable-tie proposal was not specific enough to explain how many needed to be used, where they should be placed, what they should be made from and whether different types made from different materials might act differently based on the placement, number, and weight of the individual pulling on or standing on the shelf.

As for the warning labels, Smith's expert report identifies excerpts from the Madix shelving catalogue on "Additional Shelving Safety Pointers" instructing customers "that Madix shelves should never be used as ladders to reach higher shelves," albeit in small type and located at page 63 of the 70-page brochure. *See* (Dkt. No. 68-2, at 2). He then opines that this "warning" in the brochure failed to adequately inform customers of the risks involved with climbing on the shelves and also of the danger that the shelves could dislodge causing a customer to fall. *Id*. at 6–7. Also included in the report is what appears to be sample signs warning against climbing on shelves that Smith procured through a web search. *Id*. at 6. It was not until his subsequent deposition that Smith provided two sample warning labels specific to the Madix storage units that he suggests should be utilized. *See* (Dkt. No. 68-1, at 9); *see also* (Dkt. 69-6, at 86:19–88:5). But again, Smith's ultimate conclusion is not supported by data, sampling, testing, or research and therefore its reliability is questionable.

In sum, Smith's ultimate conclusions—that labels warning against climbing on the storage units and warning that the shelves could become dislodged, and that metal clips or cable ties securing the shelves make for a superior design—are not reliable because Smith has not "adhered to the standards of intellectual rigor that are demanded in [his or her] professional work, such as relying on the data generated by other researchers, making proper personal observations or taking other appropriate actions." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996); *see also Winters*, 498 F.3d at 742–43. As an exercise of permissible discretion, the record reflects there is simply "too great an analytical gap between the data and the opinion proffered" by Smith in his expert report. *See Chapman*, 297 F.3d at 687.

### 3.    *Helpfulness to the Trier of Fact*

Finally, expert testimony that both fails to test any alternative design and fails to utilize the other *Daubert* methods of research is not helpful to the trier of fact. *See Winters*, 498 F.3d at 743. "Simply put, an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based on the assumption that that product fails (the very question that he was called upon to resolve)." *Id.* (quoting *Clark*, 192 F.3d at 757). As such, Smith's expert opinion and testimony is barred.

## II.    **Motion for Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends on the underlying substantive law that governs the dispute. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citations omitted). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks

and citation omitted). Because the plaintiff bears the ultimate burden of persuasion, the defendant's summary judgment burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Modrwoski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). Summary judgment is appropriate where "no reasonable jury could rule in favor of the nonmoving party." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

### A.    Product Defect

In exercising its diversity jurisdiction a district court applies the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 74–75 (1938). The parties do not dispute that Illinois law governs the case and that jurisdiction is proper in this Court. *See* (Dkt. No. 69-2, at ¶ 43); (Dkt. No. 75, at ¶ 43); *see also Lane v. Hardee's Food Sys., Inc.*, 184 F.3d 705, 707 (7th Cir. 1999).

To succeed on a strict product liability claim in Illinois a plaintiff must be able to establish "that the injury complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left the manufacturer's control." *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 525 (2008) (citing *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002)), *opinion modified on denial of reh'g* (Dec. 18, 2008). A product is unreasonably dangerous based on proof of either (1) a physical defect in the actual product; (2) a design defect in the product; or (3) a failure by the manufacturer to warn of the

danger or to instruct on the proper use of the product. *Id.* The parties do not dispute that the legal conclusion turns on whether the storage unit was unreasonably dangerous based on a design defect of the product and for failure to warn of the danger or to instruct on the proper use of the product; that is, Plaintiffs do not argue that the storage unit had a physical or manufacturing defect. *See* (Dkt. No. 2-1, at ¶ 11); (Dkt. No. 69-1, at 7-8); (Dkt. No. 74, at 4).

1. *Design Defect*

In order to prove a design defect, Plaintiffs may use either the consumer expectations test of the risk utility test. *See Sobczak v. Gen. Motors Corp.*, 373 Ill. App. 3d 910, 920 (1st Dist. 2007). In other words, Plaintiffs must show either that the product's design is defective by demonstrating that the product failed to perform as safely as an ordinary consumer would expect when the product is being used as intended or in a reasonably foreseeable manner; or that the design defect caused the injury and on the balance the benefits of the design outweigh the risk of danger inherent in the design. *See Romero v. Cincinnati Inc.*, 171 F.3d 1091, 1094 (7th Cir. 1999). "When both tests are employed, consumer expectation is to be treated as one factor in the multifactor risk-utility analysis." *Mikolajczyk*, 231 Ill. 2d at 569; *see also Schuring*, 244 F. Supp. 3d at 733 ("[T]he consumer-expectation perspective provides but one factor among many that can be considered within the risk-utility test, and alone can form the basis of proof or theory for a case.").

"Under the consumer-expectation test, a plaintiff must establish what an ordinary consumer purchasing the product would expect about the product and its safety." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 254, 256 (2007). This is an objective standard based on the average, normal, or ordinary expectations of the reasonable person; it is not dependent upon the subjective expectation of a particular consumer or user. *Id.* (citations omitted). Then, a plaintiff

must demonstrate that the product failed to perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. *Sobczak*, 373 Ill. App. 3d at 921 (citing *Calles*, 224 Ill. 2d at 256).

In support of their argument that the storage unit is unreasonably dangerous, Plaintiffs point only to the reason they think the top shelf renders the unit defective: the top shelf was "not designed to be fixed into the frame of the shelving structure. When not weighed down by items a force applied to the over hanging portion of the top shelf could cause the shelf to upend and fall." (Dkt. No. 2-1) at ¶ 11(a); *see also* (Dkt. No. 74) at 4 ("A minimal upward force on a nearly empty grid will cause the shelf to upend."). But the intended use of the storage unit was, quite simply, to store items. Clearly then, the ordinary consumer would expect that when items are placed on the storage unit, the unit will hold them. Common sense dictates that simple storage does not entail any upward force, and Plaintiffs do not offer any evidence that it does. Indeed, Plaintiffs' entire argument regarding upward force relies upon an individual who is climbing the unit; it has nothing to do with the unit's storage capabilities. *See* (Dkt. No. 74) at 4 ("The light weight of the shelf permits a relatively small upward force of 15 pounds *by a climber's grip* to upend this shelf, probably causing a climber to lose her balance and fall.") (emphasis added). Despite Plaintiffs' arguments about the top shelf of the unit, they have not offered any evidence whatsoever to demonstrate that the storage unit failed to store items, that is that the unaffixed top shelf prevents the storage unit from meeting an ordinary consumer's expectations with regard to the unit's storing capabilities. And in fact, it is not disputed by the parties that the shelves of the unit will stay in position without any vertical pulling component. (Dkt. No. 69-2, at ¶ 7); (Dkt. No. 75, at ¶ 7).

Here, the storage unit was not used in its intended manner, and accordingly the question is whether it was used in a reasonably foreseeable manner. Although Plaintiffs argue that it was, they have not supported their arguments with evidence in the record. *See* (Dkt. No. 74) at 2 ("it would be expected that users would climb the frame to place or retrieve items to save time or effort"); *id.* at 4 ("The movement of the shelf will cause a foreseeable ultimate user who climbed the frame to get or place an object on the top shelf to lose her balance and fall."). "[A]rgument is insufficient to avoid summary judgment; the nonmoving party needs to come forward with evidence." *See Beatty v. Olin Corp.*, 693 F.3d 750, 754 (7th Cir. 2012). The singular fact that Gia climbed the unit or that her supervisor may have climbed the unit before does not carry Plaintiffs' burden of demonstrating that such use was foreseeable by Madix. As such, Plaintiffs have failed to demonstrate a genuine issue of material fact concerning what an ordinary consumer expects of the storage unit sufficient to defeat summary judgment.

Regardless, the record reflects that an ordinary consumer would not expect the storage unit to support a climbing individual. Walgreens, for example, had policies that prohibited employees from climbing on store shelves, and Walgreens employees—including Plaintiff— were instructed and trained to use a ladder to reach high items and to never climb or walk on store shelves or use a makeshift ladder to reach items because these actions violated OSHA regulations. *See, e.g.*, (Dkt. No. 69-2) at ¶¶ 20–24. In the face of such policies, training, and notice, it is not reasonably foreseeable that an ordinary store worker would neglect to use a ladder and would instead climb the storage unit itself to place or procure merchandise. In total, Plaintiffs have not offered any evidence from which a reasonable jury could find that the shelf or the unit as a whole did not function as an ordinary consumer would expect and they therefore cannot succeed under the consumer expectation test. *See, e.g., Lamkin v. Towner*, 138 Ill. 2d

510, 529 (1990) (window screen manufacturer not liable for a consumer who fell through the window screen because fall prevention was not the intended use of the screen); *Gutterman v. Target Corp.*, 242 F. Supp. 3d 695, 707 (N.D. Ill. 2017) (easily removable box on a skateboard was not a design defect where the plaintiffs failed to offer evidence that the box did not perform as would be expected and where an ordinary consumer would have expected that riding a skateboard in a retail store would create a risk of falling).

Plaintiffs similarly do not satisfy the risk utility test. "Under the risk-utility test, a plaintiff may prevail in a strict liability design-defect case if he or she demonstrates that the magnitude of the danger outweighs the utility of the product, as designed." *Calles*, 224 Ill. 2d at 259 (citing *Lamkin*, 138 Ill. 2d at 529). "Stated differently, '[t]he utility of the design must therefore be weighed against the risk of harm created' and '[i]f the likelihood and gravity of the harm outweigh the benefits and utilities of the product, the product is unreasonably dangerous.'" *Id.* (citation omitted). In weighing risk versus utility, Illinois courts look to a wide variety of factors, which include "the magnitude and probability of the foreseeable risks of harm; the instructions and warnings accompanying the product; the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing; the likely effects of any alternative designs on production costs; and conformity with industry standards, voluntary organization guidelines, and government regulation." *Ferraro v. Hewlett–Packard Co.*, 721 F.3d 842, 846 (7th Cir. 2013) (citation omitted); *Winters*, 498 F.3d at 744 ("Under the risk utility test, a plaintiff may prove a design defect by presenting evidence of the availability and feasibility of alternate designs at the time of its manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or

governmental regulation.") (citation and internal alteration omitted); *accord Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 436 (2002).

On summary judgment, "the court must balance factors it finds relevant to determine if the case is a proper one to submit to the jury." *Calles*, 224 Ill. 2d at 266. "Design-defect cases that have survived summary judgment on a risk-utility theory are typically those in which the plaintiff has provided some evidence to create a material issue of fact for at least one of the above risk-utility factors." *Walker v. Macy's Merch. Grp., Inc.*, 288 F. Supp. 3d 840, 862 (N.D. Ill. 2017).

In analyzing the case under the risk-utility test, Madix makes four arguments. First, it argues that a climbing injury like the one experienced by Gia was not foreseeable because, over the past thirty years that the unit has been in circulation to the time of this lawsuit, Madix had not been aware of any injuries sustained by the shelving grid becoming dislodged. (Dkt. 69-1) at 11. Second, it argues that the storage unit met the relevant regulatory standards. *Id.* Third, it argues that to the extent the unit was dangerous because it cannot support climbing activities, that danger was obvious to the ordinary consumer as the risk of falling when climbing the unit is open and obvious. *Id.* at 11–12. Fourth, it argues that Plaintiffs have not offered any admissible evidence of an alternative design, and the opinion supplied by their now barred expert only considered the limited circumstances under which the shelves can become dislodged. *Id.* at 12.

In response, Plaintiffs—without the testimony from Mr. Smith—do not offer any evidence to create an issue of fact on any of the above factors nor do they develop argument on these or other factors, save for one: Plaintiffs dedicate one-and-a-half pages of their five-page Response to disputing the testimony of a Madix corporate representative that there have been no other climbing injuries on a storage unit in the past thirty years. *See* (Dkt. 74) at 2–4.

Specifically, Plaintiffs argue that the testimony of the representative—Paul D'Alessandro—should be inadmissible because Madix has not offered other evidence to demonstrate that it has a procedure in place to keep a reliable record of product related injuries. *Id.* at 3. In other words, instead of offering affirmative evidence or argument on any of the risk-utility factors, Plaintiffs have chosen only to challenge Madix's argument on one factor: the magnitude and probability of the foreseeable risks of harm.

Even accepting Plaintiffs' argument on this one factor, they have failed to create a triable issue on any of the risk-utility factors, largely because their only evidence on many of these points is the now-excluded testimony of Mr. Smith. *See Schuring*, 244 F. Supp. 3d at 735 (although the law does not require an expert to shoulder the entire risk-utility analysis, "that responsibility remains with the plaintiff, who must establish sufficient risk-utility evidence in the record"). By extension, they have failed to meet their burden of presenting evidence that the danger of the design of the storage unit outweighs its utility, particularly in light of the open and obvious nature of the risk assumed by Gia when she climbed the unit. *See Calles*, 224 Ill. 2d at 261–63 ("the open and obvious nature of a danger is one factor that may be weighed in the risk-utility test"). Accordingly, the Court concludes that no reasonable jury could find for Plaintiffs (who bear the burden of proof) under the risk-utility test. *See, e.g., Assaf v. Cottrell, Inc.*, 2012 WL 4177274, at *3–4 (N.D. Ill. Sept. 19, 2012) (granting summary judgment because plaintiff presented no evidence that would allow the court to balance the risks and benefits of the product's allegedly defective design).

### 2. *Failure to Warn*

Plaintiffs also pursue a failure-to-warn claim. Generally, a "manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with

respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm may occur absent a warning." *Sollami*, 201 Ill. 2d at 7. The warning's purpose is to inform the consumer about a danger of which she is not aware, thus enabling her to take appropriate measures to protect herself. *McColgan v. Envtl. Control Sys., Inc.*, 212 Ill. App. 3d 696, 700 (1st Dist. 1991). However, "[n]o duty to warn arises where the risk of harm is apparent to the foreseeable user, regardless of any superior knowledge on the part of the manufacturer." *Sollami*, 201 Ill. 2d at 11. Plaintiffs also bear the burden of showing that Madix's failure to warn of the unit's dangerous propensities proximately caused Gia's injuries, that is, that an adequate warning would have been read and heeded, and would have prevented the injuries in question. *See Walker*, 288 F. Supp. 3d at 865 (citation and quotations omitted).

Plaintiffs argue that Madix had a duty to include warning signs with the storage unit warning of (1) the potential for the top shelf to become upended and (2) the dangers of climbing on the unit. The parties do not dispute that there were no warnings or instructions about a climbing hazard anywhere on the storage unit. *See* (Dkt. No. 82, at ¶4). Still, Plaintiffs' argument on this particular claim, the entirety of which is replicated here, are focused solely on causation:

> A warning sign in the environment of use would challenge *a supervisor* who wanted the worker to rush to the top of the shelving unit. In that instance it would protect the worker despite the supervisor's yelling at her to get the stock off the shelf immediately. The worker would then take the time to find an appropriate ladder, clear a space in the aisle to place the ladder, and climb the ladder to get the stock without having to grab the grid for balance or support.

(Dkt. No. 74) at 4 (emphasis added). Somewhat confusingly, Plaintiffs argue that the warning sign would have been read and heeded by Gia's supervisor, which would have then presumably altered the supervisor's expectations and allowed Gia to access the storage unit in the way she was trained to do. The problem with this argument is that it is entirely based on speculation and

conjecture. Further, the record indicates that Gia's supervisor already was aware of the dangers of climbing the storage units (*see* Dkt. No. 82, at ¶¶ 25–26), so again, any inference that a warning sign on the unit would have altered her directions to Gia or attitude about Gia's performance is simply conjectural. Plaintiffs have not offered a single piece of evidence to support this theory or any other theory that an adequate warning would have prevented Gia's injuries. *See Sybron Transition Corp. v. Sec. Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion."). Accordingly, Plaintiffs have failed to provide evidence from which a reasonable jury could conclude that a warning would have prevented Gia's injuries, and Madix is entitled to summary judgment on this claim. *See Walker*, 288 F. Supp. 3d at 866–67 (granting summary judgment where plaintiff failed to adduce evidence that the plaintiff would have read and heeded any warning or evidence of what additional or alternative warnings were needed).

Even if Plaintiffs had succeeded in creating an issue for trial on causation, the support for their failure-to-warn claim is deficient for other reasons. As mentioned above, Madix's corporate representative Mr. D'Alessandro testified that Madix did not have a history of falls caused by the storage unit's unaffixed shelves. On the record before the Court, no reasonable factfinder could conclude that Madix had special knowledge of the storage unit's propensity to cause climbers to fall and injury themselves. *See, e.g., Ferraro v. Hewlett-Packard Corp.*, 2012 WL 394256, at *11 (N.D. Ill. Feb. 6, 2012), *aff'd*, 721 F.3d 842 (7th Cir. 2013) (where corporate testimony reflected that there "was no history of burns caused by the power adapter" no reasonable factfinder could conclude that HP had special knowledge of the adapter's propensity to burn customers). Finally, Plaintiffs also fail to show that the climbing or falling danger was non-obvious. The danger of falling under such circumstances is a matter of common knowledge

and perception. For this reason, Walgreens trained its employees not to climb on the unit and instructed them to use ladders, and Gia's supervisor Christine Cartina testified that climbing up the shelves of the unit is not safe and contrary to common sense. (Dkt. No. 83, at 65:5–21); *see also* (Dkt. No. 77, at 53 (Cartina Dep)) ("It's absolutely not safe, no. That's why they—I mean, common sense will tell you it's just the nature of the job. We tend to be quick so sometimes—but not on the grates because they're—it's—it's evident that—why would you stand on something that's moveable and not in place, right?"). An ordinary consumer would have known that climbing the unit could result in injury. *See, e.g., Ferraro*, 2012 WL 394256, at *11 (granting summary judgment where the plaintiff failed to meet "her burden of producing evidence that HP had unequal knowledge of the harm or that the danger was non-obvious," and therefore "she [] failed to demonstrate that HP had a duty to warn"); *Gillman v. Crown Equip. Corp.*, 1996 WL 464224, at *3 (N.D. Ill. Aug. 12, 1996) (where risk of falling by using a lift truck to elevate people without a safety platform was open and obvious, defendant had no duty to warn against it). For all of these reasons, Plaintiffs have failed to demonstrate that Madix had a duty to warn and Madix is entitled to summary judgment on this claim.

### B.    Loss of Consortium

Turning to Jason Winkler's claim for loss of consortium, under Illinois law this claim is "necessarily predicated on the claim of a directly injured spouse." *See Hess v. Kanoski & Assoc.*, 668 F.3d 446, 456 (7th Cir. 2012) (quoting *Monroe v. Trinity Hops.-Advocate*, 345 Ill. App. 3d 896, 899 (1st Dist. 2003)). Accordingly, Jason's claim rises and falls with Gia's claim for strict product liability so it too must fail.

## **CONCLUSION**

For the reasons set forth above, the Motion *In Limine* to Exclude Opinions and Testimony of Plaintiffs' Expert is granted. (Dkt. No. 68). Furthermore, Madix's Motion for Summary Judgment is granted. (Dkt. No. 69).

Hon. Virginia M. Kendall
United States District Judge

Date: September 7, 2018